**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| RBC Aircraft Products, Inc.,<br>        Plaintiff,<br><br>        v.<br><br>Precise Machining & Manufacturing, LLC,<br>        Defendant. | CIVIL ACTION NO.<br>3:10-cv-878 (SRU) |

**RULING ON MOTIONS FOR A NEW TRIAL AND**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

On January 17, 2013, a jury returned a verdict finding that defendant Precise Machining

and Manufacturing, LLC ("Precise") breached a five-year requirements contract with plaintiff

RBC Aircraft Products, Inc. ("RBC").[1]  The jury awarded RBC $2,986,089 in compensatory

damages.  At the close of RBC's case, Precise moved for judgment as a matter of law pursuant to

Rule 50 of the Federal Rules of Civil Procedure.  *See* Oral Motion for Judgment as a Matter of

Law (doc. # 178).  I reserved ruling on that motion.  After judgment entered, Precise timely

renewed its motion for judgment as a matter of law and filed, in the alternative, a motion for a

new trial on the issue of damages pursuant to Rule 59 of the Federal Rules of Civil Procedure

(doc. # 195).  Precise then timely filed a separate motion for a new trial pursuant to Rule 59 (doc.

# 226).  For the reasons discussed below, Precise's motions are granted in part and denied in

part.

---

[1] The products at issue in this lawsuit were produced and sold by plaintiff RBC Aircraft Products, Inc., which is a division of RBC Bearings, Inc.  This ruling does not distinguish between RBC Aircraft Products and the broader RBC Bearings, but instead refers to all products and employees related to the plaintiff as simply "RBC" products and employees.

1

I.      **Background and Procedural History**

The following facts, which are largely undisputed, are drawn from the testimony of witnesses and the exhibits entered into evidence at trial.

A.   Overview of the Parties' Relationship

Precise makes wing-assembly kits for Boeing 737 airplanes, which it sells to Spirit Aerosystems ("Spirit").  Precise has had a contract with Spirit for the 737 work since 1995, and the 737 contract makes up approximately two-thirds of Precise's business.  Trial Tr. 744, 844-45, Jan. 14, 2013 (Jeff Greer).  RBC is a producer of two cam-follower bearings – "18s" and "20s" – that are specially designed to fit Boeing 737s.  Trial Tr. 51, Jan. 7, 2013 (Pat Bannon).  RBC manufactures both bearings, which are a significant part of the kit that Precise provides to Spirit.  At all times relevant to this litigation, the only other producer of those bearings was non-party Accurate Bushing Company ("Accurate").  From approximately 2004 until April 2010, RBC supplied Precise with the 18s and 20s; since April 2010, Accurate has done so.

There are two major types of contracts typically used in the aerospace supply chain – long-term agreements ("LTA") and purchase order ("PO") agreements.  LTAs typically are signed, multi-year contracts that are formal, lengthy and complex.  *See, e.g.*, Trial Tr. 291, Jan. 8, 2013 (John Clark); Trial Tr. 1199, 1202-03, Jan. 15, 2013 (John Diver).  PO agreements, by contrast, generally involve a fairly informal exchange of standardized commercial forms (including a PO), which reflect the fundamental elements of the parties' agreement – the commodity to be procured, the quantity needed, price, duration and delivery terms, and any

additional terms or conditions imposed by one or both parties.  *E.g.*, Trial Tr. 1199, Jan. 15, 2013

(John Diver).  Typically, the duration of a PO agreement is shorter than the contract period of an

LTA.  *See id.*  Precise's expert, John Diver, who served as director of supply-chain management

and procurement for Boeing and Spirit,[2] testified that approximately 80 to 85% of business in the

aerospace industry was transacted through POs.[3]  *Id.* at 1201.

      At all times relevant to this litigation, the relationship between Spirit and Precise was

governed by an LTA.  Trial Tr. 744-45, Jan. 14, 2013 (Jeff Greer).  By contrast, Precise always

transacted business with its suppliers, including RBC, through POs.  *See* Trial Tr. 282, Jan. 8,

2013 (John Clark); Davis Dep. 110:1-5, Oct. 24, 2012 (shown at trial via videotape, Jan. 15,

2013).  From 2004 until 2009, Precise asked RBC for new pricing each year and RBC provided a

price quote for a year's worth of bearings.  Precise then placed a PO for its annual requirements,

referencing RBC's price quote.  *Id.*; Trial Tr. 758-60, 857, Jan. 14, 2013 (Jeff Greer).  Upon

receipt of a PO, RBC sent an "acknowledgment" to Precise, and then manufactured and shipped

the bearings as specified in the PO.  *See id.*

      With larger, long-term customers like Precise, RBC often would enter into LTAs instead

of conducting business through the less formal PO agreements.  RBC attempted to obtain a

signed multi-year agreement with Precise several times over the 2004 to 2009 period.  *See* Trial

Tr. 58, Jan. 7, 2013 (Pat Bannon).  Each time RBC asked, however, Precise replied that it was

---

[2] Diver testified that Spirit and Boeing are essentially the same company; Spirit was formed when Boeing divested one of its plants during a merger with another company.  Trial Tr. 1189-90, Jan. 16, 2013 (John Diver).
[3] Diver also testified that a requirements contract typically would be embodied in a signed LTA rather than a PO agreement.  *Id.* at 1203.

not interested in an LTA, because of the nature of its relationship with Spirit.  *See id.*; Trial Tr. 933-34, Jan. 14, 2013 (Phil Miller).

The Precise-Spirit LTA was a fairly one-sided document that clearly advantaged Spirit over Precise.  It required Precise to comply with strict terms, including the obligation to hold its prices over the course of the agreement, while providing Spirit with great flexibility.  *Id.* at 746, 788; *see also* Def.'s Exs. 209-10.  This disparity in power is particularly evident in the LTA's "Termination for Convenience" provision, which unequivocally permits Spirit to "terminate all or part of an Order . . . by written notice to the seller," Def.'s Ex. 210 at 17, effectively enabling Spirit to terminate the entire contract at its convenience at any time.  Trial Tr. 1204, Jan. 16, 2013 (John Diver); Trial Tr. 752, 762-63, 787, Jan. 14, 2013 (Jeff Greer).  According to Diver, this type of provision provided a purchaser like Spirit with great leverage over a seller like Precise.  Trial Tr. 1222-23, Jan. 16, 2013 (John Diver).  With the power to terminate came the ability to re-negotiate the terms of the LTA mid-contract, because Precise knew that it might lose the work altogether unless it complied with Spirit's demands.  *See id.*  Thus, there was an inherent vulnerability in its relationship with Spirit, which is why Precise repeatedly rebuffed RBC's attempts to enter into an LTA.  Trial Tr. 933-34, Jan. 14, 2013 (Phil Miller).

B. <u>Spirit Puts Precise's Work out to Bid</u>

The power of the Termination for Convenience provision is illustrated by the events that transpired in 2009.  At that time, the LTA between Precise and Spirit covered the period from June 2006 until June 2011 (though it gave Spirit a unilateral option to extend until February 2013).[4]  *See* Def.'s Ex. 209 at 17.  In early 2009, however, Spirit informed Precise that it was putting the 737 contract out to bid two years before the LTA (minus the option period) expired.  Trial Tr. 763, Jan. 14, 2013 (Jeff Greer).  The year 2008 was a particularly bad one for the aerospace industry – between the financial crisis and a major strike at Boeing – and, as a result, Spirit sought a price reduction of approximately 20% for the 737 contract.  *See id.* at 765.  This news was "devastating" to Precise, because Spirit had not put its 737 work out for bid "on the street" since 1995.  *Id.* at 763.  Moreover, Spirit made it clear that it was serious about the price reductions when it pulled a small portion of Precise's work after Precise bid too high, which "scared the heck" out of Precise.  Trial Tr. 428, Jan. 8, 2013 (Brian Christiano); Pl.'s Ex. 10.

C. <u>Precise Asks RBC for Five-Year Pricing</u>

Fearing the loss of its most important customer (and the potential loss of revenue that a 20% price reduction would yield even if it kept the business), Precise scrambled to find ways to cut costs.  Trial Tr. 869, Jan. 14, 2013 (Jeff Greer); Trial Tr. 940, Jan. 14, 2013 (Phil Miller).  As part of its strategy, Precise asked its suppliers – including RBC, whose cam-follower bearings constituted a significant portion of the overall cost of the kits – for price reductions.  Trial Tr.

---

[4] At trial, Jeff Greer testified that the unilateral option to extend was essentially a "redundant right," because the Termination for Convenience provision gave Spirit the right to renege at any time.  Trial Tr. 787, 789-90, Jan. 14, 2013 (Jeff Greer).

766-68, 790, Jan. 14, 2013 (Jeff Greer).  Because Precise had to quote Spirit a fixed price for five

years, it sought five-year discounted pricing from RBC, to incorporate into its bid to Spirit.  *Id.*

On May 5, 2009, Precise's vice president, Phil Miller, its purchasing manager, Katherine

Davis, and its controller, John Bookout met with representatives of RBC – including RBC's

general manager, Pat Bannon, and its aerospace sales and marketing manager, Brian Christiano –

to discuss pricing and issues related to inventory and quality.  *See id.*; Pl.'s Exs. 10-11.  During

the meeting, Precise's representatives explained that Spirit was asking for a 20% price reduction

on the 737 contract and that Precise consequently was looking for price reductions as well.  *Id.*

RBC already knew that Spirit was putting the 737 work out to bid and that Spirit likely would

seek reduced pricing from Precise.  *See* Trial Tr. 419-20, Jan. 8, 2013 (Brian Christiano).  RBC

also knew that its competitor, Accurate, typically offered much lower prices, which meant that

Accurate was an attractive alternative supplier for Precise to use in putting together its bid.  *See*

Pl.'s Ex. 10.  RBC therefore sought to deter Precise from considering a switch in suppliers

without having to quote a rock-bottom price itself.  *See id*.

At the meeting, the RBC representatives criticized Accurate's quality and performance.

Trial Tr. 387, 424, Jan. 8, 2013 (Brian Christiano).  They also asserted that RBC needed a

commitment for Precise's business if it was going to quote reduced prices, and again raised the

prospect of an LTA – even handing Miller a sample LTA to sign.  *Id.*; Trial Tr. 62, Jan. 7, 2013

(Pat Bannon); Trial Tr. 933-34, Jan. 14, 2013 (Phil Miller).  Miller was vehemently opposed, and

explained that Precise did not sign LTAs with its suppliers, because Spirit had the ability to

cancel their contract at any point.  *Id.*; Trial Tr. 1060-61, Jan. 15, 2013 (John Bookout).  RBC's

representatives clarified that Precise would not be required to purchase any parts if it did not

have any business, but Miller still refused to consider an LTA.  Trial Tr. 63-64, Jan. 7, 2013 (Pat

Bannon).  On cross examination, Christiano admitted that it was perfectly clear to him at the

May 5, 2009 meeting that Precise would not enter into an LTA with RBC.  Trial Tr. 423, Jan. 8,

2013 (Brian Christiano).

Despite this hitch, both parties left the meeting optimistic about the status of their

relationship.  The RBC representatives did not further pressure Precise to sign an LTA, nor did

they indicate that an LTA or a five-year requirements contract was a necessary precondition to

future business between the companies.  *See* Trial Tr. 145, 150, Jan. 7, 2013 (Pat Bannon); Trial

Tr. 933, Jan. 14, 2013 (Phil Miller); Davis Dep. 199:20-21 (noting that the RBC representatives

"seemed on board with [Miller's refusal to sign an LTA]" and that "[i]t seemed like they

understood").  Precise's representatives expressed satisfaction with RBC's delivery performance

and willingness to meet shifting inventory needs, and told the RBC representatives that they

would have a right of last refusal before Precise made any decision to switch suppliers.  *See* Pl.'s

Ex. 10.  Davis also assured them that Precise had no intention of "splitting the business" – i.e.,

utilizing multiple suppliers for the cam-follower bearings.[5]  Trial Tr. 387, 435-36, Jan. 8, 2013

(Brian Christiano); Davis Dep. 94:2-22; 102:15-22.

---

[5] The parties, however, did not clarify what was meant by "splitting the business."  Davis testified at her deposition that she thought RBC's concerns about splitting the business meant that RBC did not want Precise to contract with multiple suppliers – i.e., grant RBC less than 100% of the volume – during 2010, the term of PO 72423.  Davis Dep. 103:10-11; 134:8-11 & 17-21.  Phil Miller concurred, testifying that he understood "splitting the business" to mean

RBC and Precise did not begin price negotiations at the May 2009 meeting; instead, the parties left it that RBC would work to put together a quote to submit to Precise. Christiano walked away from the meeting with the feeling that the cam-follower business was RBC's to lose. Pl.'s Ex. 10.

> D.  RBC Submits a Price Quote; Precise Places Purchase Order 72423

On May 19, 2009, two weeks after the parties' meeting, Christiano emailed Davis a pricing proposal for 2010 through 2015 orders. Pl.'s Ex. 14. RBC proposed a gradual 15% decrease in price, with the price of the 18s to begin at $97.22 in 2010 and decrease to $86.98 by 2015, and the price of the 20s to start at $107.76 and decrease to $96.41 over the same period. Pl.'s Exs. 13-14. Precise rejected this proposal, because Spirit was asking for an immediate reduction and Precise needed pricing that fit Spirit's requirements to incorporate into its bid. Trial Tr. 1030, Jan. 15, 2013 (Phil Miller).

On or about June 3, 2009, Christiano spoke with Davis by phone and proposed a fixed price of $89 for the 18s and $91 for the 20s for 2010 through 2015. Davis Dep. 115:18-116:2. Christiano told Davis that RBC was willing to provide those prices as long as Precise would not split the business, and Davis replied that Precise would not split the business. *Id.* On Friday, June 5, Davis requested that RBC put the quote in writing so that Precise could "finalize this today." *See* Pl.'s Ex. 19. Christiano replied via email with the substantive terms of a price

---

ordering their yearly needs from more than one supplier. Trial Tr. 986, Jan. 14, 2013 (Phil Miller). Miller added that "splitting the business" was different than "being in the mix," by which he meant soliciting quotes from multiple suppliers for 100% of yearly orders. *Id.*

quote, explaining that Davis could rely on those terms and that RBC would provide an official

quote the following Monday.  Pl.'s Ex. 20.

On June 8, 2009, RBC submitted a price quote, valid for sixty days, which matched the

information provided in Christiano's email of June 5.  RBC's quote priced the 18s at $89 and the

20s at $91.  It listed a lead time of thirty-five weeks for each part[6] and provided a quantity term

for each of 1 to 9,999 – a placeholder indicating that the quote was valid for whatever quantity

Precise needed to order.  Pl.'s Ex. 1; Def.'s Ex. 282.  The quote also stated:

> FOR DELIVERIES THROUGH 12-31-2015.
> PRICING IS SUBJECT TO 100% OF THE VOLUME THAT
> PRECISE HAS TO BUY DURING THIS PERIOD.

*Id.*  Finally, it provided that if an order was placed, "RBC order terms & conditions will apply."

*Id.*  On cross examination, Bannon agreed that nothing in the price quote indicated that it was

contingent on Precise signing any sort of LTA.  *See* Trial Tr. 153, Jan. 7, 2013 (Pat Bannon).

RBC customer service representative Dolly Lamanna testified that the computer program

RBC used to generate quotes had no option to input a multi-year term.  Lamanna Dep. 23:2-4,

June 30, 2011(shown at trial via videotape, Jan. 16, 2013).  The only way to incorporate this or

any other non-standard term into a quote was by inputting the relevant information into the

program's "notes" section, which is what she did with the quote for the cam followers.  *Id.* at

41:3-42:6.  Neither Lamanna nor Christiano recalled incorporating this type of language into a

price quote before, *id.* at 25:23-26:9; 42:17-21; Trial Tr. 455, Jan. 8, 2013 (Brian Christiano),

---

[6] At trial, Jeff Greer testified that the cam followers were ordered with such a large lead time because they are
complex parts, so Precise needed to provide ample time for their production in order to stay ahead of Spirit's
requirements.  *See* Trial Tr. 760-61, Jan. 14, 2013 (Jeff Greer).

and RBC's vice president of sales and marketing, John Clark, testified that this was the first time RBC ever submitted a multi-year price quote to Precise, Trial Tr. 282, Jan. 8, 2013 (John Clark).

Upon receipt of the quote, no one at Precise contacted RBC indicating that it was confusing or problematic in any way.  Davis testified that based on the language of the quote, she believed Christiano had done exactly what she asked – quoted for five years.  Davis Dep. 145:9-16; *see also* Trial Tr. 399-400, Jan. 8, 2013 (Brian Christiano).

On July 9, 2009, Precise submitted PO 72423, which incorporated the price of $89 for the 18s and $91 for the 20s for deliveries from August 2010 through December 2010.[7]  Pl.'s Ex. 2.  Purchase order 72423 contained no language indicating that the prices submitted would be valid beyond 2010 or that there was any multi-year agreement between the parties.  *See id.*; *see also* Trial Tr. 443, Jan. 8, 2013 (Brian Christiano) (acknowledging that nothing in PO 72423 reflected pricing contingent on Precise committing to RBC for five years); Def.'s Ex. 236 (email from Christiano to Clark noting that the term of PO 72423 was April 28, 2010 through November 26, 2010, and that it contained no indication of a five-year commitment).  Nevertheless, upon receipt of PO 72423, Christiano recalled thinking that RBC had "won" the business for five years, because the PO incorporated the prices from RBC's quote.  Trial Tr. 395, Jan. 8, 2013 (Brian Christiano).

---

[7] At the time Precise submitted PO 72423, RBC and Precise had a PO in place covering deliveries until May 2010, which was modified subsequent to the May 2009 meeting to extend to deliveries through July 2010, but eventually was changed back, as indicated in a revision to PO 72423.  Trial Tr. 773-76, Jan. 14, 2013 (Jeff Greer); Pl.'s Ex. 25 (adding delivery dates for May, June and July 2010 at $89 and $91, the prices listed in RBC's June 2009 quote).

On July 13, 2009, RBC sent Precise an acknowledgment that reflected the price, delivery

dates and quantities contained in PO 72423, but made no mention of any multi-year agreement.

Pl.'s Ex. 3.  Clark testified that the acknowledgment was a standard confirmation document; it

confirmed receipt of the PO and that RBC would begin performance of the customer's order.

Trial Tr. 292, Jan. 8, 2013 (John Clark).  Lamanna testified that customer service was

responsible for reviewing a customer's PO before issuing an acknowledgment, to make sure that

the price, quantity, delivery schedule, part numbers and total value all matched.  *Id.* at 26:10-

27:9; 45:20-46:9.  It was not her responsibility to compare the notes section of the price quote

with the PO.  *Id.* at 34:8-13.  If the necessary terms of the PO matched the quote, customer

service would enter the terms into the computer and the program would automatically generate

an acknowledgment.  *Id.* at 47:21-25.  If the terms did not match, then customer service would

inform the customer and the relevant project manager.  *Id.*  Lamanna personally reviewed PO

72423 and concluded that the terms matched; therefore, RBC sent an acknowledgment to

Precise.  *See id.* at 28:6-14; *see also* Trial Tr. 417, Jan. 8, 2013 (Brian Christiano) (stating that

customer service never contacted him regarding any problem with PO 72423; the terms of the

PO did not contradict anything in the quote); Trial Tr. 132, Jan. 7, 2013 (Pat Bannon)

(confirming that no one at RBC ever contacted Precise requesting additional language on PO

72423 to reflect five years of demand).

RBC's acknowledgment contained "terms and conditions," which stated, in relevant part:

[W]e have . . . found it necessary for the orderly conduct of our business to adopt
a uniform acceptance.  We sell you the products mentioned in your order upon the

> following exclusive conditions. . . . All orders and contracts solicited by any
> representative of this company are subject to approval by the company at its
> Home Office in West Trenton, New Jersey.

Pl.'s Ex. 3.  Clark testified that this language simply was intended to ensure that "the company at

certain levels ha[d] authorized" a transaction; it did not indicate that further action needed to be

taken before a PO could be accepted.  Trial Tr. 294, Jan. 8, 2013 (John Clark).  Clark stated that

in this case, because a multi-year agreement was involved, RBC's CEO approved the terms of

the price quote before RBC sent the quote to Precise.  *Id.* at 295-96.  Clark also testified that the

acknowledgment form was out of date, because RBC's home office had moved from West

Trenton, New Jersey to Oxford, Connecticut some time before.  *Id.* at 295.

Upon receipt of the acknowledgment, Davis' purchasing team at Precise checked to make

sure that the terms of the acknowledgment matched the PO.  Davis Dep. 166:8-11.  Davis

testified that everything in RBC's July 13, 2009 acknowledgment matched PO 72423.  *Id.*

In August 2009, Precise sent a revised version of PO 72423, which added delivery dates

for May, June and July of 2010, but otherwise did not change the language or terms of the

original PO.  *See* Pl.'s Ex. 25.  In mid-September, Precise received confirmation from Spirit that

it would be awarded the 737 contract and that the contract would run through December 2013

(with the unilateral option for Spirit to extend until December 2015).  *See* Pl.'s Ex. 30.  Davis

emailed Christiano and others at RBC to pass on the good news.  *Id*.  The parties did not further

discuss the terms of PO 72423 at that time.  *See id.*

During the course of negotiations over the 737 contract, Spirit asked Precise to incorporate its new, reduced pricing in January 2010, a year and a half before the previous LTA was set to expire.  Trial Tr. 783, Jan. 14, 2013 (Jeff Greer).  Early incorporation of the new pricing meant a $200,000 per month ($3.6 million total) reduction in revenue for Precise.  *Id.*; Trial Tr. 1071, Jan. 15, 2013 (John Bookout); *see also* Def.'s Exs. 253, 255.  Precise nevertheless acquiesced to Spirit's request, because it was the only way to keep the 737 work.  *See id.* Consequently, in November 2009, Bookout sent a letter to Christiano explaining the basic terms of the new 737 contract and asked Christiano if RBC would be willing to early incorporate its new prices as well.  *See* Pl.'s Ex. 35; Def.'s Exs. 229-30.  RBC refused.  *Id.*

In January 2010, Precise sent RBC additional revisions to PO 72423, which lowered the quantity of parts to be shipped per month.  *See* Pl.'s Ex. 44.  The revisions did not affect pricing or delivery dates.  *See id.*  RBC entered the changes into its system on January 27, 2010.  *Id.*

E. The Relationship Between RBC and Precise Breaks Down

Accurate submitted quotes for the cam followers in the spring of 2009, around the time Precise was negotiating with RBC, and Accurate's quoted prices were slightly lower than RBC's at that time.  *See* Def.'s Ex. 280 (chart noting prices quoted by RBC and Accurate as of June 4, 2009).  Precise decided to stick with RBC for its 2010 orders, however, because it would only save about $8,000 by switching to Accurate, a savings that was not worth the risk of switching to a new supplier – especially one that RBC had warned Precise about.  Trial Tr. 1062, 1067, Jan. 15, 2013 (John Bookout); Trial Tr. 937, Jan. 14, 2013 (Phil Miller).

13

On December 14, 2009, Joey Fradd, a member of Precise's purchasing department, submitted a new quote request to Accurate for the 18s and 20s.  *See* Pl.'s Ex. 37; Def.'s Ex. 281. Greer and Davis both testified that the purpose of this inquiry was to get an idea of Precise's options for the future.  Trial Tr. 793, Jan. 14, 2013 (Jeff Greer); Davis Dep. 220:2-22.  Upon receiving Fradd's email, Accurate's national sales manager, John Palumbo, replied that Accurate had previously quoted the cam followers and that Precise should have those quotes in its records. Pl.'s Ex. 37; Def.'s Ex. 281.  Four days later, however, Accurate's president, Pete Dubinsky, contacted Fradd with a new quote that priced the 18s at $80.75 and the 20s at $82.50 through December 31, 2015.  *See* Pl.'s Ex. 38.  Precise did not act on Accurate's quote at that time, because it already had PO 72423 in place for 2010 and it was not yet time to place orders for 2011.  Trial Tr. 793, Jan. 14, 2013 (Jeff Greer); Davis Dep. 220:2-22.

On March 15, 2010, Bookout emailed Davis a chart depicting Precise's savings on the cam followers through 2015 if it switched to Accurate at $80.75 and $82.50 in January 2011, rather than staying with RBC at $89 and $91.  *See* Pl.'s Ex. 47; Def.'s Ex. 288.  Bookout's chart reflected a savings of $113,000 per year if Precise made the switch.  *Id.*  That same day, Fradd emailed Dubinsky to follow up on the December 2009 quote, which had expired by that point. *See* Pl.'s Exs. 38, 46.  Dubinsky replied that Accurate was running the "Accurate Bushing Stimulus Plan" and would provide Precise a guaranteed 5% price reduction from the previously-quoted price, good through 2015, if Precise placed an order for both parts.  *See* Pl.'s Ex. 61.

Shortly thereafter, Davis emailed Christiano to request a quote for 2011 deliveries.  Davis Dep. 20:16-20.  Davis testified that she contacted Christiano because she believed that Precise and RBC did not yet have an agreement in place for 2011.  *See id.* at 21:4-11.  On March 22, Christiano replied that RBC's price quotation clearly stated that its five-year pricing was in exchange for 100% of Precise's volume for five years.  Precise had placed orders off of that quote; therefore, RBC and Precise had a binding agreement through 2015.  *See* Def.'s Ex. 233; *see also* Trial Tr. 127, Jan. 7, 2013 (Pat Bannon).

Davis wrote back that Precise had a very different understanding of RBC's quote.  *See* Pl.'s Ex. 55; Trial Tr. 402, Jan. 8, 2013 (Brian Christiano).  The delivery term through 2015 and corresponding "statement that talks about 'pricing subject to 100% of PMM's volume'" were "interpreted by [Precise] as a guarantee for us that the pricing would not go up."  *See* Pl.'s Ex. 55; Davis Dep. 35:17-36:3; *see also* Trial Tr. 945-46, Jan. 14, 2013 (Phil Miller).  Davis asserted that Precise's interpretation was consistent with the parties' discussions at the May 5, 2009 meeting, where Precise explained that it needed five-year pricing and an approximately 20% price reduction in order to secure a new LTA with Spirit, but emphasized that it could not enter into an LTA with RBC.  *See id.*; *see also* Davis Dep. 95:7-15 ("[We] said . . . we don't do long-term agreements.  We had a year purchase order.  We asked for a price that [RBC] could live with till 2015 because we're quoting out that long, and we want an idea of what [its] price is going to do.").  It was also consistent with how the parties historically had done business – yearly price quotes and POs.  *See* Davis Dep. at 166:13-19.

15

Davis' email made it clear to Christiano that Precise had misinterpreted RBC's quotation. *See* Trial Tr. 402, 463, Jan. 8, 2013 (Brian Christiano).  On March 23, 2010, Christiano emailed Clark, copying Bannon and others, explaining the "jist" of his interaction with Davis.  He wrote:

> Precise is trying to back out of our agreement that we have with them for the . . . cam followers through 2015.  They just got a bid from Accurate that "is too good to ignore."  I re-sent them the quote which we issued last year that clearly states the pricing is subject to 100% of their business through 2015, which they placed PO's against and have on our books now.  They never would sign an LTA with any supplier because their business with Spirit was year to year, but our quotation clearly stated the time frame and the 100% volume commitment.

Def.'s Ex. 235.  Clark replied, in full: "Ughhh! We have never been able to get a signed LTA at Precise; year to year as we all know.  Even when Brian was charming Margaret.  Accurate will be doing this to us this summer at Airbus, too, if we don't buy them out!"[8]  *Id.*

On March 25, Bannon and Christiano spoke with Miller about the disagreement over PO 72423.  *See* Def.'s Ex. 242.  After their conversation, Miller was hopeful that RBC would provide new pricing for the parts Precise had already ordered.  Trial Tr. 949, Jan. 14, 2013 (Phil Miller).  Precise did not want to switch suppliers for 2010, even if it meant paying more for the cam followers, because new parts might take thirty weeks to obtain and a shortage of the bearings could shut down the 737 line.  *See id.* at 947-48.

Around the same time, however, RBC decisionmakers commenced internal discussions on how best to leverage their position with Precise, to secure the work for five years.  By March 26, RBC had developed a strategy: (1) obtain a signed LTA confirming a five-year agreement or

---

[8] RBC considered acquiring Accurate in the spring of 2010 as an alternative means of preserving the cam-follower business; however, RBC ultimately did not pursue that option.  *See* Trial Tr. 165-66, Jan. 7, 2013 (Pat Bannon).

hold the parts "hostage" and refuse to ship; and (2) buy all the pyrowear (the material needed to make the cam followers) on the market, so that Accurate physically could not meet Precise's needs in the short term. *See* Def.'s Exs. 237-39; Trial Tr. 136-37, 172-74, Jan. 7, 2013 (Pat Bannon). Bannon testified that the decision to purchase the pyrowear was not to sabotage Accurate or Precise, but to ensure that it had enough material to continue to supply the cam followers for five years, as RBC believed it had an agreement to do. Trial Tr. 136-37, Jan. 7, 2013 (Pat Bannon).

RBC was aware that the Boeing 737 assembly line might shut down if Precise did not receive the cam followers as scheduled. *See* Def.'s Ex. 240. Bannon and Clark both testified that RBC did not intend for that to happen, because Boeing was a "huge customer" – accounting for approximately 40% of RBC's $200 million business – and RBC did not want to negatively impact Boeing. Trial Tr. 40, Jan. 7, 2013 (Pat Bannon); Trial Tr. 307, Jan. 8, 2013 (John Clark). Nevertheless, on March 26, RBC put Precise's PO on credit hold, so that no parts would ship. Def.'s Ex. 241.

On March 29, Bannon sent an email to Miller, and attached a letter from John Clark.[9] Def.'s Ex. 242. In the body of the email, Bannon emphasized that RBC wished to formalize an LTA in writing, so that it could resume shipments of the cam followers. *Id.* The attached letter

---

[9] It appears that Clark did not actually sign off on the final version of the letter that was sent. Internal RBC emails from April 1, 2010 indicate that Clark believed a letter to RBC would contain an option for Precise to accept pricing that was double the prices listed in PO 72423. *See* Def.'s Ex. 51. Christiano informed Clark that "Doc" (presumably RBC President and CEO Dr. Michael J. Hartnett) had rejected that option, out of concern that "Boeing will get wind of it and just think we're being greedy." *Id.* So, instead, RBC had decided to proceed by telling Precise that it would withhold parts without an LTA. *See id.*; Def.'s Ex. 252. Clark expressed frustration and dismay at being left out of the loop, and asserted: "It's clear they are not going to sign an LTA – they've told us that 40 times already. What are we sending them to change their mind? I'm a little confused here." Def.'s Ex. 252.

explained RBC's belief that it had entered into a "balanced agreement" with Precise, whereby RBC had provided fixed pricing for a lengthy period in exchange for Precise's commitment to purchase the cam followers from RBC for the entire period.  *See id.*  It emphasized that RBC had "invested considerably in a number of areas relative to this Agreement between our two companies," including sales and administration costs, raw material, work-in process and finished goods.  *Id.*  It also noted that RBC had $903,960 of product on backlog for the two cam followers.  *Id.*  The letter concluded by expressing RBC's desire to continue to try to reach an understanding with Precise.  *See id.*

Miller replied to Bannon's email, indicating that Precise's position was firm.  *See* Def.'s Ex. 244.  He wrote: "I want to be clear that a ***reply*** under a request for quotation in no way constitutes a long term business agreement.  It simply provides Precise with the necessary pricing data to construct our Purchase Order agreement.  Precise has neither signed nor consented to an LTA regarding these parts."  *Id.* (emphasis in original).  Miller reiterated that Precise did not enter into LTAs with its suppliers because of the nature of its relationship with Spirit.  *Id.*  That was made clear at the May 5, 2009 meeting – when he refused to sign the LTA provided by RBC – and Precise's position had not changed.  *Id.*  Miller warned that if RBC continued to refer to its quote as a long-term agreement, then it was unlikely that the parties would be able to "find any common ground."  *Id.*  Miller's email closed: "Please let us know if you will be honoring our current p.o. and at what price so we can inform Spirit and Boeing as to the outcome of this situation."  *Id.*

18

During a telephone conference held later that day, Greer reaffirmed Precise's position. He also stated that Precise could not enter into any type of LTA with RBC unless the agreement granted Precise the right to terminate for convenience, like Spirit had in its LTA with Precise. Trial Tr. 138, Jan. 7, 2013 (Pat Bannon).  Bannon told Greer that RBC would never enter into a contract like that with Precise.  *See id.*

Despite the parties' disagreement, on April 1, a member of Precise's purchasing department sent Lamanna a quote request for the cam followers, copying Davis and Christiano. Pl.'s Ex. 69; Def.'s Ex. 261.  Approximately fifteen minutes earlier, though, Christiano had emailed Davis and Miller to inform them that RBC had shipped all parts ordered under the "old PO" and that it would not begin shipping under PO 72423 unless Precise signed an LTA.  Pl.'s Ex. 68; Def.'s Ex. 248.  Christiano's email stated that RBC needed "this issue put to bed before shipping any product against the PO that is at the center of this issue" and attached a two-page LTA.  *Id.*; *see also* Def.'s Ex. 247 (email from Christiano to Jim Good at RBC asserting RBC's position that it provided a "good faith" quotation that Precise was "acting in bad faith by voiding" and stating: "If they don't sign [an LTA], then we won't ship any parts.").

RBC's proposed LTA expressly provided: "Precise agrees to exclusively purchase its requirements for Products . . .  from RBC and RBC hereby agrees to sell to Precise one hundred percent (100%) of the quantities needed to meet Precise's requirements for Products through 12-31-2015 from [June 8, 2009]."  Pl.s Ex. 68; Def.'s Ex. 248.  Clark testified the purpose of this term, and of the LTA more broadly, was simply to confirm and formalize the "multi-year

19

contract" already in place – RBC's quote and PO 72423 reflecting the quoted prices.  Trial Tr.

291, 299, Jan. 8, 2013 (John Clark); *see also* Trial Tr. 170-71, Jan. 7, 2013 (Pat Bannon).

Greer replied to Christiano's email: "Precise needs to know immediately if RBC intends

to honor the Purchase Order for the 2010 requirements that we have a signed acknowledgment

from RBC for."  Def.'s Ex. 250; *see also* Pl.'s Ex. 71.  If not, he wrote, Precise needed revised

pricing and a "clear justification" for any price increase.  *Id.*  Greer warned that if RBC did not

provide "clear direction" by the close of business, then Precise would "proceed with notifying

Spirit AeroSystems and Boeing that your failure to honor your purchase order agreement may

create a work stoppage to the 737 program."  *Id.*

On April 5, Bannon replied, in full:

> RBC's response is simple.  We believe Precise accepted RBC's 5 yr pricing 37
> weeks ago when you placed a PO against our quote.  We are prepared to honor
> that pricing as long as Precise honors our LTA agreement thru 12/31/2015.  We
> are continuing with the production of your product and we are prepared to support
> all deliveries thru 2015.  We DO NOT intend to provide pricing for 2010 demand
> only.  As soon as we receive the signed LTA we will resume shipments.  As of
> today we are current with all Precise purchase orders and our next shipments
> scheduled for April 28th are on track.  Please sign the LTA and return prior to that
> date to avoid any product stoppage.

Pl.'s Ex. 71.  RBC and Precise did not communicate again until the end of April.  Trial Tr. 820,

Jan. 14, 2013 (Jeff Greer).

On April 26, Curt Hieb of RBC emailed Bannon, Christiano and Clark stating that RBC's

dispute with Precise was "starting to get some ugly responses within Spirit."  Def.'s Ex. 258.

Hieb recommended that RBC "tread lightly," because "any chance of us stopping [the] 737 line

because of a contract dispute with another supplier is not going to sit well with Spirit." *Id.*  Hieb advised RBC to "inform everyone today if we plan to ship parts this week," and suggested that it would be better to "let the legal system work its course" if RBC truly had a case against Precise, rather than giving Spirit the impression that it was holding parts hostage. *Id.*  Clark responded that RBC had not yet held any parts hostage, because the next shipment was not due until April 28, but that RBC should schedule a conference call with Spirit's management in Tulsa.  Def.'s Ex. 259.

Clark forwarded the email chain to key RBC decisionmakers, asserting: "[n]obody is blinking, Precise nor RBC." *Id.*  He urged them to figure out how to proceed before the next shipment was due to go out; in the meantime, he would try to find out what Spirit's inventory looked like. *Id.*; *see also* Def.'s Ex. 260 (email from Clark asking Hieb to find out when the stock of cam followers would "all dry up").  RBC's president, Dr. Michael Hartnett, replied that RBC "should not blink," but should instead "find a way to recoup the 17% discount we provided over the last 12 months" under the agreement made last year." *Id.*

On April 30, Bannon emailed Davis and attached a "revised letter," which "amend[ed] RBC's position on the cam follower bearings you have under contract."  Pl.'s Ex. 81; Def.'s Ex. 262.  The letter indicated that RBC was willing to continue its relationship with Precise if Precise would either commit to ordering exclusively from RBC through December 2015 or accept a price of $130.70 for the 18s and $143.89 for the 20s for all deliveries scheduled under PO 72423. *Id.*  Bannon's email informed Davis that the new, increased pricing reflected RBC's "unabsorbed

costs should Precise continue to not recognize our 5 yr commitment." *Id.*  Bannon also stated

that RBC had the necessary product in stock and could support Precise's "open order May 5th

dock date as well as the remainder of the open 2010 demand." *Id.*  The letter added that RBC

"ha[d] no intention of causing an interruption of supply" and reaffirmed that it could ship the

May 5 order if Precise provided a response by noon on Monday, May 3.  *Id.*

Greer testified that he and Phil Miller were surprised and confused when RBC provided

new pricing "out of the blue," because in early April RBC clearly indicated that it would not do

so.  Trial Tr. 820, 885, Jan. 14, 2013 (Jeff Greer); *see also* Trial Tr. 957, Jan. 14, 2013 (Phil

Miller).  He replied to Bannon's email and letter that same day, stating: "Attached you will find

Precise's response to the letter you provided this morning.  We consider this matter to now be

closed and wish you well in your continued business."  Pl.'s Ex. 82.  The letter reaffirmed

Precise's position that the "contractual document that governs the relationship between RBC

Bearings and Precise is Purchase Order 72423 and your associated acknowledgment of that

purchase order" and that "[n]owhere in that agreement or in your acknowledgment acceptance

did RBC stipulate any long term demand contingency." *Id.*; Def.'s Ex. 263.  Instead, "your

company signed a commitment to provide product on schedule at a price for the terms of the

purchase order." *Id.*  It was Precise's understanding, based on the communications of April 1

and April 5, that RBC was not willing to comply with the terms of PO 72423 and that it would

not ship any parts under that order in its current form.  *Id.*

Greer openly expressed consternation, asserting that RBC had "taken steps to misrepresent Precise's position on this issue directly with our customer in a manner intended to damage the reputation and credibility of our company" and that RBC's "expressed threat and commitment to disrupt our line and the lines of our customers" in early April had "forced [Precise] to take extreme and costly measures to establish an alternative source of supply."  *Id.* He indicated that although RBC's stated investment in the cam followers was "unfortunate," that investment was "a business decision that was made on RBC's part," the consequences of which Precise bore no responsibility for, because Precise's short-term commitment did not justify a long-term investment.  *Id.*  The letter closed by acknowledging the "long and cooperative relationship" between RBC and Precise on the 737 program, but indicated that Precise believed the companies' positions on PO 72423 to be completely irreconcilable and that it had no intention of proceeding under any of the terms proposed by RBC.  *See id.*

RBC officially stopped work on the 18s and 20s on or about May 4, 2010.  Def.'s Ex. 267.  At trial, Bannon testified that the reason RBC did not ship to Precise was that RBC believed it had an agreement based on getting all of Precise's demand for the period listed in its price quote and the agreement became null and void once RBC realized that Precise did not intend to deal exclusively with RBC through 2015.  Trial Tr. 95, Jan. 7, 2013 (Pat Bannon). RBC opted to take off the market the cam followers it already had produced or had the materials to produce, rather than selling them to Boeing, for use as spare parts, or to Precise's new

supplier, Accurate, for resale.  *See* Def.'s Ex. 271; Def.'s Ex. 272; *see also* Trial Tr. 1237, 1239,

Jan. 16, 2013 (Pete Dubinsky).

      F.  <u>Precise Switches to Accurate</u>

     On March 26, 2010, Precise placed an order with Accurate for 20 of each type of cam

follower.  *See* Pl.'s Ex. 64; Def.'s Ex 257.  At trial, Greer testified that the purpose of this order

was to provide Precise with an adequate sample, to test quality and fit.  Trial Tr. 800-01, Jan. 14,

2013 (Jeff Greer).  At that point, he asserted, Precise was simply looking to evaluate Accurate's

product; it had not yet committed to switching suppliers.  *Id.* at 801.

     On April 6, 2010, Precise submitted a PO to Accurate for the remainder of its 2010

requirements and its complete 2011 requirements.  Def.'s Ex. 264.  Unlike PO 72423, the PO

sent to Accurate contained specifications that mirrored the basic terms of Precise's LTA with

Spirit.  First, it contained the same durational term: "This contract will remain in force between

Precise Machining and Accurate Bearing thru 2013 with a two year option."  *Id.*  Second, it

indicated that the option was exercisable solely by Precise. *See id.*  Third, it granted Precise the

ability to adjust deliveries in the event of a strike or change in customer requirements and

expressly provided that the contract was valid only as long as Precise had the 737 contract with

Spirit.  *Id.*  Fourth, it contained specific quality and on-time requirements that Accurate had to

meet in order for the contract to remain in force.  *See id.*  Finally, the PO stated: "By

acknowledging this Purchase Order you are agreeing to all the above terms."  *Id.*

At trial, Greer testified that Precise incorporated this language into its PO with Accurate as a direct result of its dispute with RBC.  Trial Tr. 974-77, 909-10, Jan. 14, 2013 (Jeff Greer). Precise never had included this type of language before, but it is now standard in its POs.  *Id.* Greer testified that the PO reflected a commitment from Accurate to hold its prices for the duration of Precise's LTA with Spirit.  *Id.* at 910-13.  Although the PO indicated that Precise and Accurate had a contract that would remain in force through 2013, Precise was free to ask for further reductions from Accurate or even to solicit new quotes and switch suppliers during this period.  *See id.*  Accurate's president, Dubinsky, generally agreed with this interpretation of the PO.[10] Trial Tr. 1289, Jan. 16, 2013 (Pete Dubinsky).

> G.   This Lawsuit

RBC instituted this diversity action in June 2010, asserting that the parties had entered into a five-year requirements contract for the cam-follower bearings or, at a minimum, that they had an agreement for 2010 deliveries, and that Precise breached their agreement on or about April 30, 2010, when it unequivocally stated that it would not purchase bearings from RBC.  *See* Compl. (doc. # 1).  In the alternative, RBC sought damages for promissory estoppel or unjust enrichment.  *Id.*  Precise denied breaching any agreement between the parties and filed a counterclaim asserting that RBC breached its obligation to deliver to Precise the bearings it ordered in 2009, through PO 72423. Answer and Countercl. (doc. # 17).

---

[10] Dubinsky also testified that the agreement Accurate had with Precise would fit his definition of an LTA.  Trial Tr. 1267, Jan. 16, 2013 (Pete Dubinsky).

The parties have never disputed that they had a contract and that their contractual relationship fell apart during the spring of 2010.  But they fundamentally disagree on the terms of that contract and the manner in which it was formed.  Throughout this litigation, RBC has maintained that its price quote was an offer that Precise accepted through submitting PO 72423. Precise, by contrast, consistently has asserted – both at the summary judgment stage and in its oral motion for judgment as a matter of law at trial – that PO 72423 was the offer and RBC's acknowledgment the acceptance.  Precise believes that RBC's price quote was a mere solicitation for an offer and that it could not have been an offer, as a matter of law, because boilerplate language in RBC's forms indicated that RBC meant to have final say over the terms of the agreement.  Because that language reasonably could be interpreted in different ways and because the quote otherwise contains significant detail, I sent the case to the jury to resolve the factual issues of whose form governed and on what terms.

After the jury returned a verdict in favor of RBC, Precise timely filed a renewed motion for judgment as a matter of law or, in the alternative, a motion for a new trial on damages, and also timely filed a separate motion for a new trial.  With respect to liability, Precise argues that it is entitled to judgment as a matter of law, because no reasonably jury could have found that RBC's price quote was an "offer" that Precise "accepted."  Alternatively, Precise asserts that it is entitled to a new trial, because the jury's finding that Precise and RBC entered into a five-year "requirements" contract was against the weight of the evidence, and because the jury charge did not adequately instruct the jury on the issues of "offer" and "acceptance" as applied to price

quotes and purchase orders.  With respect to damages, Precise asserts that the jury's award was excessive because it grants RBC damages for lost future profits beyond December 31, 2013 – the date its contract with Spirit was up and any future business was not guaranteed.  Therefore, Precise asks that the court grant a new trial on damages, reduce the amount of the verdict, or grant remittitur of all post-2013 lost profits.

I held oral argument on Precise's motions on July 19, 2013.  At the argument, I raised, *sua sponte*, whether the language in RBC's price quote could have amounted to an offer to enter into a five-year requirements contract, or whether it simply conveyed an offer for pricing.  In other words, accepting that RBC's quote contained sufficient information to be an offer, did acceptance of that offer bind Precise to deal exclusively with RBC through 2015 or did the pricing subject to 100% volume language simply impose a condition on Precise's ability to obtain bearings at the quoted price.  Although that issue is related to Precise's argument that the parties did not enter into a five-year requirements contract, neither party raised it at summary judgment or in connection with the post-trial motions.  *See* Hr'g Tr., July 19, 2013 (doc. # 253).  Accordingly, I reserved ruling on Precise's post-trial motions and ordered supplemental briefing on issues related to the formation of a requirements contract.

## II.    Standards of Review

### A.    Motion for Judgment as a Matter of Law

Rule 50(b) of the Federal Rules of Civil Procedure provides for the entry of judgment as a matter of law where a jury renders a verdict for which there is no legally sufficient evidentiary

basis.   The standard under Rule 50 is the same as that for summary judgment: A court may not

grant a Rule 50 motion unless "the evidence is such that, without weighing the credibility of the

witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as

to the verdict that reasonable [persons] could have reached."   *This Is Me, Inc. v. Taylor*, 157

F.3d 139, 142 (2d Cir. 1998) (citation and internal quotation marks omitted).   Thus, "the court

must give deference to all credibility determinations and reasonable inferences of the jury . . .

and it may not itself weigh the credibility of the witnesses or consider the weight of the

evidence." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.

1998) (citations omitted).   The movant's burden is particularly heavy, however, when "the jury

has deliberated in the case and actually returned its verdict in favor of the non-movant," because

a Rule 50(b) motion enables the movant to win its case as a matter of law, notwithstanding the

jury's conclusion to the contrary.   *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013)

(per curiam) (citation omitted).   In such circumstances, judgment as a matter of law may only be

granted if:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's
>      findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that
>      reasonable and fair minded persons could not arrive at a verdict against it.

*Galdieri-Ambrosini*, 136 F.3d at 289 (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of

Elec. Workers*, 34 F.3d 1148, 1154 (2d Cir. 1994)) (internal quotation marks omitted); *see*

*also Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997).  The test on a Rule 50(b) motion is not the strength or weakness of the evidence, but whether the evidence presented was such that a "reasonable juror would have been compelled to accept the view of the moving party." *Densberger*, 125 F. Supp. 2d at 590 (citing *This Is Me Inc.*, 157 F.3d at 142).

Ordinarily, a post-trial motion for judgment as a matter of law under Rule 50(b) "is limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]; the movant is not permitted to add new grounds after trial." *Galdieri-Ambrosini*, 136 F.3d at 286 (internal quotation marks omitted).  "[T]he purpose of requiring the moving party to articulate the ground on which [judgment as a matter of law pursuant to Rule 50(a)] is sought is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury."  *Id.* at 287 (internal citations and quotation marks omitted).  Therefore, "[t]he ultimate question is whether the [Rule 50(a)] motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof."  *Id.*  A court may not grant a Rule 50(b) motion on grounds not specified in the Rule 50(a) motion "unless that result is required to prevent manifest injustice."  *Id.*; *Cruz*, 34 F.3d at 1155; *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986).

B.    Motion for New Trial

After a jury trial, "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party – for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "After giving the parties notice and

an opportunity to be heard," the court may also "grant a timely motion for a new trial for a

reason not stated in the [party's] motion."  Fed. R. Civ. P. 59(d).  In either case, a new trial

"should not be granted unless the court is convinced that the jury has reached a seriously

erroneous result or that the verdict is a miscarriage of justice."  *Kosmynka v. Polaris Indus.*, 462

F.3d 74, 82 (2d Cir. 2006).

"Unlike judgment as a matter of law, a new trial may be granted even if there is

substantial evidence supporting the jury's verdict."  *DLC Mgmt. Corp. v. Town of Hyde

Park*, 163 F.3d 124, 134 (2d Cir. 1998).  On a Rule 59(a) motion for a new trial the court may

consider the credibility of the witnesses and the weight of the evidence; however, "Rule 59 is not

a vehicle for the relitigation of old issues, presenting the case under new theories, securing a

rehearing on the merits, or otherwise taking a 'second bite at the apple.'"  *Lawyers Title Ins.

Corp. v. Singer*, 792 F. Supp. 2d 306, 312-13 (D. Conn. 2011) (quoting *Svege v. Mercedes-Benz

Credit Corp.*, No. 3:01cv1771, 2004 WL 2377485, at *3 (D. Conn. Sept. 28, 2004) (internal

citations omitted)).

## III.    Discussion

Article 2 of the Uniform Commercial Code ("UCC"), as adopted in Connecticut at

General Statutes section 42a-2-191 *et seq*., applies to "transactions in goods."  Conn. Gen. Stat. §

42a-2-102.  Article 2 of the UCC applies in this case, because the transaction at issue – supply of

the cam-follower bearings – involves the sale of goods.  Therefore, the provisions of Article 2 of

the UCC govern the parties' dispute, which centers around which party's form constituted the "offer" to enter into a contract and on what terms.

A.  <u>Whether RBC's Quote Could Have Been an "Offer" that Precise "Accepted"</u>

Section 2-204 of the UCC provides: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Conn. Gen. Stat. § 42a-2-204(1).  Section 2-207 adds: "A definite and seasonable expression of acceptance . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."  Conn. Gen. Stat. § 42a-2-207. Thus, the UCC takes a flexible approach to contracting, rejecting the common law's mirror-image rule and recognizing that a contract exists whenever it appears from the facts that the parties intended to enter into one.  It acknowledges that commercial parties often enter into agreements through an exchange of forms, which contain different, mostly boilerplate, terms and conditions.  *See, e.g.*, *Saturn Const. v. U.S. Concrete Sys. Corp.*, No. CV91 070 22 38, 1992 WL 4495, at *4 (Conn. Super. Ct. Jan. 6, 1992).

With this flexible approach to contract formation, however, it is often difficult to determine which party's form was the "offer" and which the "acceptance."  The UCC does not define the term "offer," so courts continue to apply the common law rule that an offer is "a 'manifestation of willingness to enter into a bargain, which would justify another person [in] understanding that his assent to that bargain is invited and will conclude it.'"  *Retrofit Partners I,*

*L.P. v. Lucas Industries, Inc.*, 47 F. Supp. 2d 256, 262 (D. Conn. 1999) (quoting Restatement

(Second) of Contracts § 24).  Because identifying which party's form constitutes the offer largely

depends on the facts and circumstances of the case, resolution of this issue presents a

paradigmatic jury question.  *See Architectural Metal Sys. v. Consolidated Sys.*, 58 F.3d 1227,

1230 (7th Cir. 1995) (vacating summary judgment because whether price quote was an offer

presented genuine issue of material fact).  Precise, however, asserts that RBC's price quote was

not an offer as a matter of law and, in the alternative, that the jury instructions were erroneous

and misleading with respect to this issue.

### i.   *RBC's Quote Could Have Been an Offer*

Generally speaking, a price quotation is treated as "an invitation for an offer, rather than

an offer to form a binding contract."  *White Consolidated Industries, Inc. v. McGill Mfg. Co.,*

*Inc.*, 165 F.3d 1185, 1190 (8th Cir. 1999); *see also Audio Visual Assocs., Inc. v. Sharp Elecs.*

*Corp.*, 210 F.3d 254, 259 (4th Cir. 2000); *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 572

(6th Cir. 1999); *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 650 (E.D. Pa.

2002).  Where an exchange of commercial forms is at issue, the buyer's purchase order, rather

than the seller's price quote, typically is treated as the offer.  *See Sharp Elecs.*, 210 F.3d at 259.

Whether a price quotation contains sufficient information to constitute an offer "depends

primarily upon the intention of the person communicating the quotation as demonstrated by all of

the surrounding facts and circumstances."  *Dyno Const. Co.*, 198 F.3d at 572; *Rich Products*

*Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 956 (E.D. Wisc. 1999) ("What is required for a

particular quotation to be treated as an offer is not subject to precise delineation.  The question

turns upon the unique facts and circumstances of each case."); *see also Berquist Co. v. Sunroc

Corp.*, 777 F. Supp. 1236, 1250 (E.D. Pa. 1991) (leaving to the jury the question whether a

particular document constituted an offer).  Relevant factors, however, "include the extent of prior

inquiry, the completeness of the terms of the suggested bargain, and the number of persons to

whom the price quotation is communicated."  *Rich Products*, 66 F. Supp. 2d at 956 (citing

Restatement (Second) of Contracts § 26 cmt. c).

RBC's quote was presented to Precise after lengthy discussions about Precise's specific

needs with respect to the 737 contract.  The quote was not an open solicitation to prospective

buyers to place orders; it was communicated only to Precise.  Substantively, RBC's price quote

contained information about the products to be supplied, the lead time between orders and

delivery, the delivery method, quantity parameters, price, a durational term, restrictions on

competition, a minimum order requirement, and charges for additional certifications.  Pl.'s Ex. 1.

Thus, a reasonable jury could have found that the price quote was "sufficiently detailed, such

that all a buyer need say is 'I accept to create an enforceable contract.'"  *Rich Products*, 66 F.

Supp. 2d at 956 (quoting *Falcon Tankers, Inc. v. Litton Systems, Inc.*, 355 A.2d 898, 904 (Del.

Super. 1976)); *see also Brown Mach. v. Hercules, Inc.*, 770 S.W.2d 416, 419 (Mo. App. 1989).

Precise acknowledges that RBC's quote was fairly detailed, but argues that the quote did

not and could not have ripened into an offer, because RBC's forms indicated that RBC would

have final say over the terms of the contract.  The quote stated: "[i]f [an] order is placed by

Precise, RBC order terms & conditions will apply." Boilerplate language in RBC's

acknowledgment, in turn, provided those terms and conditions. Pl.'s Ex. 3. And one of those

terms was that "[a]ll orders and contracts solicited by any representative of this company are

subject to approval by the company at its Home Office in West Trenton, New Jersey."[11]  *Id.*

Precise argues that this caveat – a restriction that any "solicited" "order" be approved by higher

ups at RBC – precluded the quote from being an offer as a matter of law.

It is true that a party may prevent an otherwise complete document from being treated as

an offer "by suitable language conditioning the formation of a contract on some further step . . .

such as approval by corporate headquarters." *Architectural Metal Sys.*, 58 F.3d at 1230; *see also*

*Brown Machines*, 770 S.W. 2d at 419 ("Brown's price quote was merely a proposal, not an offer,

because of its provision that Hercules' acceptance was not binding upon Brown until Brown

acknowledged the acceptance."). The language in RBC's quote, however, did not have that

effect. Although RBC's acknowledgment indicated that approval was required for "all"

"solicited" "orders and contracts," the form was silent regarding the timing of that approval. At

trial, RBC executives testified that they approved the quote before it was sent, and that Precise

knew that to be true. The jury was free to credit that testimony.[12]  Because the jury reasonably

---

[11] As Clark testified at trial, the acknowledgment form was somewhat outdated – RBC's headquarters had moved from West Trenton, New Jersey to Oxford, Connecticut well before RBC sent the acknowledgment to Precise in 2009. Trial Tr. 295, Jan. 8, 2013 (John Clark).

[12] It is also worth noting that the language in RBC's acknowledgment relating to corporate approval was boilerplate. In many cases, parties to an agreement will not even read, much less negotiate over, the preprinted boilerplate on commercial forms. Although some courts have relied on boilerplate terms in assigning the labels "offer" and "acceptance" to various parties' commercial forms, *see Brown Machines*, 770 S.W. 2d at 419, others have held that "boilerplate is often immaterial when deciding whether a document should be construed as an offer or an acceptance," *e.g.*, *Rich Products Corp.*, 66 F. Supp. 2d at 958. Here, Precise relies on boilerplate twice removed as

could have found that RBC's quote constituted an offer, and Precise's purchase order an acceptance, there is no legal error in a verdict that treated the quote as an offer.  Precise's motion for judgment as a matter of law is therefore denied to the extent that it is based on this issue.

> ii.   *The Jury was Properly Instructed on "Offer" and "Acceptance"*

Precise alternatively moves for a new trial on the ground that the jury was improperly instructed on the law of offer and acceptance, as applied to price quotes and purchase orders.  "A new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law." *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 696 (2d Cir. 1993) (citation and internal quotation marks omitted); *Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 139 (2d Cir. 2008) (citing *BAII Banking*).  "An erroneous instruction requires a new trial unless the error is harmless."  *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006) (quoting *LNC Invs., Inc. v. First Fidelity Bank, N.A.*, 173 F.3d 454, 460 (2d Cir. 1999) (internal citations omitted)).  "An erroneous jury instruction is harmless if it is clear that it did not influence the jury's verdict."  *Id.*

Precise objects to the following language in the instructions:

No strict rule governs when a price quote, purchase order, or acknowledgement is an offer or acceptance.  Some courts have noted that a price quote is often just an invitation to negotiate, and a purchase order is the first offer, because in many circumstances a price quote will only contain a few terms.  But other courts have

---

the basis for characterizing the price quote as a solicitation instead of an offer – the quote's boilerplate incorporated by reference more boilerplate, including the corporate approval clause at issue.  And for that clause to affect the way Precise understood the quote, Precise would have to have known what the acknowledgement would say, and believed that lack of approval could sour the whole deal.  That presented the jury with questions of fact – whether Precise knew that RBC's unstated terms and conditions contained a clause requiring corporate approval, and whether it also believed that corporate approval always occurred after an order was placed.  The jury heard evidence on those issues, and, as noted above, disagreed with Precise's interpretation.

also held that a price quote can constitute an offer when it contains sufficient detail so that assent is all that is needed to ripen the offer into a contract. You should apply the rules outlined above to determine if each of the critical documents in this case is an offer or acceptance.

Jury Instructions at 13 (doc. # 188). Precise asserts that this language does not clearly reflect the state of the law, because the *general rule* is that price quotations are not offers. The instructions should have made it clear that there is a general rule (price quotes are not offers) and that this rule is subject to certain exceptions (e.g., where a quote contains sufficient detail and there are no conditions on acceptance). Precise asserts that by framing the issue as reasonably debatable, rather than stating the majority rule, the instructions may have misled the jury and led to an erroneous verdict.

The aspect of the jury instructions that Precise takes issue with was neither misleading nor inaccurate in its statement of the law. The instruction clearly conveys the necessary message: there is no strict rule governing which document is the offer. Price quotes often are treated as invitations for offers, but at times have been found to contain sufficient detail to constitute a controlling offer. It is true that price quotes generally do not contain sufficient detail and/or are not targeted enough to be offers, but whether and when a price quote becomes an offer is not formulaic; it depends on the facts and circumstances of the case. *See, e.g.*, *Tibor Mach. Products, Inc. v. Freudenberg-NOK Gen. P'ship*, 967 F. Supp. 1006, 1017 (N.D. Ill. 1997) (rejecting argument that POs were necessarily "offers" not "acceptances" because the fact that POs generally are offers "is simply [a] rule of thumb, not ironclad doctrine"). Moreover, despite the reference to "some courts" and "other courts," the instructions do not ask the jury to decide

36

between two distinct approaches to contract interpretation.  Instead, they simply convey that

courts have been presented with different factual scenarios, causing some to note that price

quotations often are invitations to negotiate while others have had occasion to note that a quote

may be sufficiently detailed to invite assent.

Here, the parties introduced documentary evidence explaining the contents of the quote

and the related negotiations over the cam-follower bearings.  They called witnesses, including

expert witnesses, who testified to the general standards in the aerospace industry with respect to

this issue and the specific circumstances in which RBC submitted its price quote to Precise.  The

jury instructions properly guided the jury; they explained that although a price quote is often

simply an invitation to negotiate, a detailed price quote may itself constitute an offer to enter into

a contract.  The wording of the jury instructions does not warrant granting a new trial.

B.  Whether the Parties Agreed to a Five-Year Requirements Contract

Assuming the quote was an offer, the critical question remains: "what are the terms of the

parties' final agreement?"  RBC asserts that its quote contained an offer to enter into a five-year

requirements contract and that Precise bound itself to such a contract by incorporating the prices

listed in RBC's quote into its purchase order.  As support for its position, RBC points to the

operative language in the quote, which states:

FOR DELIVERIES THROUGH 12-31-2015.
PRICING IS SUBJECT TO 100% OF THE VOLUME THAT
PRECISE HAS TO BUY DURING THIS PERIOD.

Pl.'s Ex. 1. By incorporating RBC's pricing into PO 72423, RBC argues, Precise accepted not only the listed prices for the cam-follower bearings, but also an obligation to purchase 100% of its volume from RBC through December 31, 2015. The jury apparently accepted that contention, awarding RBC damages for Precise's breach of a five-year requirements contract.

Precise firmly maintains that the quote was not an offer for a five-year requirements contract as a matter of law and that the jury's conclusion to the contrary was against the weight of the evidence. Precise's argument, however, always has focused on the mechanics of the law of offer and acceptance rather than the substance of RBC's price quote itself. In Precise's estimation, because PO 72423 rather than RBC's quote was the offer, RBC's "pricing is subject to 100% volume" term, which is not reflected in Precise's PO (the offer) or RBC's acknowledgment (the acceptance), did not form part of the contract between the parties.[13] Yet, at no point did Precise assert that the pricing is subject to 100% volume term, if incorporated into the parties' agreement, would not have bound the parties to a five-year requirements contract. Because the parties did not dispute the substance of the quote, I did not consider this language in my previous decisions and instead left all issues of contract interpretation to the jury.

After hearing all of the evidence at trial, however, I began to question whether RBC's quote was sufficient to bind Precise to a five-year requirements contract. My doubts arose because the evidence clearly and overwhelmingly indicated that Precise would not willingly have entered into a long-term agreement and that RBC knew Precise was firmly against a long-term

---

[13] At the summary judgment stage, Precise argued in the alternative that even if RBC's quote was an offer, Precise's PO was a counter offer that RBC accepted through its acknowledgment – though Precise appears to have abandoned that argument post-trial.

arrangement when it submitted its quote.  Whether entered into through a formal LTA or an informal exchange of forms, a five-year requirements contract is, in fact, a long-term agreement. Therefore, the jury's interpretation of the parties' contract did not seem to reflect the surrounding circumstances, and caused me to examine the terms of the contract more closely, in light of the law on requirements contracts.

Section 2-306 of the UCC expressly recognizes the existence of requirements contracts. A "requirements" contract is a contract "in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller."  *Propane Indus., Inc. v. Gen. Motors Corp.*, 429 F. Supp. 214, 218 (W.D. Mo. 1977) (internal citations omitted).  The buyer typically does not agree to purchase any specific amount; however, "the requisite mutuality and consideration for a valid contract is found in the legal detriment incurred by the buyer in relinquishing his right to purchase from all others except from the seller."  *Id.*  Therefore, an "essential element" of any requirements contract is "the promise of the buyer to purchase exclusively from the seller" or "some other form of consideration flowing from the buyer to the seller."  *Id.*; *see also, e.g.*, *In re Modern Dairy of Champaign, Inc.*, 171 F.3d 1106, 1108 (7th Cir. 1999); *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 205 (Fed. Cir. 1992); *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 876 F. Supp. 2d 1042, 1053 (N.D. Ind. 2012) ("The promise in a requirements contract contains one very definite element

that specifically limits the promisor's future liberty of action; he definitely promises that he will buy of no one else.") (internal citations omitted)).

A promise of exclusivity can be express or implied; ultimately, it is the intent of the contracting parties, rather than "the presence or absence of magic terms" that is dispositive to the requirements contract analysis. *Ceredo Mortuary Chapel, Inc. v. United States*, 29 Fed. Cl. 346, 350-51 (Fed. Cl. 1993). As a result, "contracts which proclaim themselves to be requirements contracts might not be . . . [and] contracts which do not mention the term can be requirements contracts." *Id.* (internal citations omitted); *see also, e.g.*, *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 378 (7th Cir. 2000) (holding contract was not requirements contract despite use of term "requirements" in contract language).

Without an express or implied reciprocal promise of exclusivity on the part of the buyer, "[t]he promise of the seller becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer." *Propane Indus.*, 429 F. Supp. at 218-19 (citing 1A Corbin On Contracts § 157 (2d ed. 1963); *Streich v. General Motors Corp.*, 5 Ill. App. 2d 485 (1955); Annotation, 26 A.L.R.2d 1139, 1148)); *see also, e.g.*, *MM Global Servs., Inc. v. Dow Chem. Co.*, 283 F. Supp. 2d 689, 702 n.5 (D. Conn. 2003), *adhered to on reconsideration*, No. CIV. 3:02CV 1107 (AVC), 2004 WL 556577 (D. Conn. Mar. 18, 2004).

Here, it is clear that RBC hoped to bind Precise to a requirements contract that would last through December 31, 2015. The question is whether RBC's offer conveyed that message to Precise and whether Precise expressly or impliedly promised to purchase exclusively from RBC

for that period.  In determining whether the jury could have found a five-year requirements

contract between RBC and Precise, I start with the plain language of the parties' agreement – the

price quote and PO 72423 – to determine whether its terms are clear or ambiguous.[14]

"Contract language is ambiguous if it is capable of more than one meaning when viewed

objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement."  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill*

*Lynch, Pierce, Fenner & Smith Inc*., 232 F.3d 153, 158 (2d Cir. 2000) (internal citations and

quotation marks omitted).  "When the express terms of an alleged contract are ambiguous . . .

extrinsic evidence of the circumstances surrounding execution of the alleged contract may be

considered."  *Propane Indus*, 429 F. Supp. at 220; Conn. Gen. Stat. § 42a-2-202.  Typically,

interpretation of ambiguous contract language is a question of fact for the jury; however, "the

court may resolve ambiguity in contractual language as a matter of law if the evidence presented

about the parties' intended meaning [is] so one-sided that no reasonable person could decide the

contrary."  *Compagnie Financiere*, 232 F.3d at 158 (quoting *3Com Corp. v. Banco do Brasil,*

*S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999) (internal quotation marks omitted)); *see also Shepley*

*v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999) (noting that summary

judgment may be granted "when the language is ambiguous . . . but the extrinsic evidence creates

no genuine issue of material fact and permits interpretation of the agreement as a matter of law").

---

[14] The question whether language in a contract is clear or ambiguous is a question of law to be decided by the court. *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000).

RBC's quote contains a durational term ("FOR DELIVERIES THROUGH 12-31-2015") that is consistent with a five-year agreement and a quantity range (1-9,999) that is consistent with a requirements contract.  The phrase "PRICING IS SUBJECT TO 100% OF THE VOLUME THAT PRECISE HAS TO BUY DURING THIS PERIOD," however, does not clearly convey a condition barring Precise from dealing with another supplier.  Contrary to RBC's assertions, the most natural reading of this term, especially in the context of a price quote, is that RBC was imposing only a condition on pricing – i.e., the *prices* listed in the quote would remain valid only so long as Precise purchased 100% of its needs from RBC.  Fairly read, this term does not indicate that it would be a breach of the parties' contract if Precise, after placing an order with RBC, decided to obtain bearings from a different supplier.  *See In re Modern Dairy of Champaign*, 171 F.3d at 1108 (declining to find requirements contract where seller agreed to sell product at specified price over course of year but buyer could not point to any language indicating it would be breach of contract to obtain product elsewhere).  When contrasted with the language RBC used in its proposed LTA – "Precise agrees to exclusively purchase its requirements for Products . . . from RBC and RBC hereby agrees to sell to Precise one hundred percent (100%) of the quantities needed to meet Precise's requirements for Products through 12-31-2015 from [June 8, 2009]" – the pricing is subject to 100% volume language in RBC's price quote appears even less like an offer for a five-year requirements contract.  Pl.s Ex. 68; Def.'s Ex. 248.

The terms of PO 72423 contain little, if anything, to bolster RBC's assertion that its quote conveyed a promise to sell the cam-followers to Precise through December 31, 2015 in exchange for a return promise to buy exclusively from RBC.  The PO incorporates the prices listed in the quote, but it contains no indication of a commitment by Precise to purchase all of its bearings from RBC through 2015 – a reality which RBC itself admitted at trial.  *See* Def.'s Ex. 236 (email from Christiano to Clark noting that the term of PO 72423 was April 28, 2010 through November 26, 2010, and that it contained no indication of a five-year commitment); Trial Tr. 443, Jan. 8, 2013 (Brian Christiano) (acknowledging the same).  PO 72423, in both its original and amended forms, only contains orders through 2010 and makes no reference to orders beyond 2010.  Pl.'s Ex. 2.  Thus, nothing in the PO itself indicates that Precise understood RBC's price quote to be an offer to enter into a requirements contract or that it accepted RBC's offer on those terms.  In short, no promise to enter into a requirements contract can be gleaned through examining the language of the contractual documents alone.  *See id.*

It is therefore tempting to conclude as a matter of law that the pricing subject to 100% volume language in RBC's quote did not impose a contract term obligating Precise to purchase its bearings exclusively from RBC through December 31, 2015.  Yet, although the language of the parties' contract does not obviously conform with RBC's interpretation, it is at least conceivable that the language in RBC's price quote, when combined with the duration and quantity terms, conveyed an offer to enter into a requirements contract that Precise impliedly accepted through incorporation of RBC's pricing.  Because the meaning of the parties'

agreement is ambiguous, an examination of the surrounding circumstances is warranted.  *See, e.g.*, *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999) (holding that language obligating buyer to purchase "such quantities of the items listed herein as it might order or schedule" "certainly does not establish the existence of a requirements contract," but finding it could not conclude from that language "as a matter of law, that the contract is not such a contract").

From the parties' undisputed course of dealing and the circumstances surrounding the exchange of forms in this case, it is beyond any doubt that Precise did not intend to bind itself to a five-year requirements contract and that it did not expressly or impliedly promise RBC to obtain five years of orders.[15]  First and foremost, as a matter of policy, Precise did not enter into binding LTAs with any of its suppliers, because of the termination for convenience provision in its contract with Spirit.  Trial Tr. 933-34, Jan. 14, 2013 (Phil Miller).  That provision not only gave Spirit the ability to cancel orders mid-contract, it also provided Spirit with leverage to negotiate a better deal at any time.  Def.'s Exs 209-10; Trial Tr. 1204, 1222-23, Jan. 16, 2013 (John Diver); Trial Tr. 750-52, 762-63, 787, Jan. 14, 2013 (Jeff Greer).  That is exactly what happened in 2009; Spirit put the 737 contract out to bid two years before its contract with Precise was due to expire and told Precise that in order to keep the work it would have to reduce its prices by approximately 20%, effective January 1, 2010.[16]  Because Precise's position was so

---

[15] The facts on which this analysis relies are completely unaffected by credibility determinations.  Simply put, RBC did not dispute the pertinent facts.

[16] The actual events that transpired shed light on why Precise's fears were not assuaged by RBC's assurances that even with an LTA, Precise had no obligation to purchase any parts if it had no orders to fill.  *See* Trial Tr. 63-64,

vulnerable with respect to Spirit, it uniformly refused to get locked into long-term commitments with suppliers.

Second, RBC had good reason to know that Precise would not enter into an LTA, because Precise repeatedly voiced its aversion to LTAs throughout the course of the parties' contractual relationship.  From 2004 until 2009, Precise and RBC entered into annual purchase-order agreements for Precise's yearly requirements.  Trial Tr. 57, 121, Jan. 7, 2013 (Pat Bannon); Trial Tr. 758-60, 857, Jan. 14, 2013 (Jeff Greer).  More than once during this period, RBC inquired whether Precise would be amenable to signing an LTA.  Trial Tr. 58, Jan. 7, 2013 (Pat Bannon).  Precise consistently responded that it did not enter into LTAs with its suppliers.  *Id.* Despite Precise's expressed unwillingness, RBC again pressed for an LTA at the May 5, 2009 meeting between the parties, and presented Precise with a sample LTA to review.  Precise's vice president, Phil Miller, again clearly explained that Precise did not sign LTAs with its suppliers.  Trial Tr. 62, Jan. 7, 2013 (Pat Bannon); Trial Tr. 933-34, Jan. 14, 2013 (Phil Miller).  Moreover, Miller's explanation made it clear that Precise's aversion to LTAs stemmed not from their formal nature or detailed terms, but from the fact that they imposed long-term commitments.  *See id.*

---

Jan. 7, 2013 (Pat Bannon).  If Precise got locked into a long-term agreement with a supplier, then it would risk having to supply parts to Spirit at a significantly lower price than it paid the supplier to obtain them.  It was bad enough for Precise that it had to endure losses from January through April 2010, after RBC refused to early incorporate the reduced pricing contained in PO 72423.  Rather than risk sustaining major losses for an extended period, Precise limited the duration of its obligations to suppliers and kept its contractual relationships confined to the more informal POs instead of formal, restricting LTAs.

On a related note, although Precise eventually entered into a multi-year contract with Accurate, that contract gave Precise powers – including the ability to terminate – that were substantially similar to those Spirit had in its LTA with Precise.  Def.'s Ex. 264.  Precise communicated to RBC that it would only accept an LTA on those terms and RBC replied that it would *never* accept an agreement on those terms.  Trial Tr. 138, Jan. 7, 2013 (Pat Bannon).  Thus, Precise's later agreement with Accurate has no bearing on its previous refusal to enter into a long-term agreement with RBC.

Thus, RBC had no reason to believe that it could get Precise to accept a binding five-year requirements contract – a long-term agreement – through the back door of the PO process.

Third, when Precise asked RBC for five-year pricing at the May 5, 2009 meeting, it was in the context of putting together its bid to Spirit.  Because Spirit was asking for a dramatic price reduction up front, Precise was looking for similar reductions from its suppliers and it needed projections for five years in order to place a sensible bid with Spirit.  In the course of the parties' negotiations, RBC never expressly conditioned its provision of five-year pricing on Precise's promise to enter a five-year requirements contract.  *See* Trial Tr. 58-61, 145, 150, Jan. 7, 2013 (Pat Bannon).  Although RBC indicated that it did not want to "split the business," RBC did not explain that this statement meant it needed a five-year requirements contract – an agreement that clearly would have altered the status quo.[17]  *See id.*  And even if it had, Precise foreclosed the possibility of a binding five-year commitment in exchange for five-year pricing at the May 5, 2009 meeting, when Miller unequivocally stated that Precise did not enter into long-term agreements with its suppliers.

Finally, RBC does not dispute that Precise did not interpret its quote to offer a five-year requirements contract.  *See* Trial Tr. 402, 463, Jan. 8, 2013 (Brian Christiano).  RBC may have intended to communicate an offer for a five-year requirements contract, but Precise quite clearly did not understand the pricing subject to 100% volume language as mandating exclusivity for

---

[17] Davis and Miller both testified that Precise interpreted "split the business" to mean issuing a PO for less than 100% of its annual needs, something which Precise had never done and had no intention of doing.  Davis Dep. 103:10-11; 134:8-11 & 17-21; Trial Tr. 986, Jan. 14, 2013 (Phil Miller).  This interpretation is reasonable; Precise logically inferred that RBC did not want to suffer a double hit to its income – lower margin (price) per piece on a lower number of pieces (volume).

five years.  And Clark, for one, did not even appear surprised to hear of the mix up, writing to

Christiano and Bannon: "Ughhh! We have never been able to get a signed LTA at Precise; year

to year as we all know.  Even when Brian was charming Margaret."  Def.'s Ex. 235.

In sum, the parties' course of dealing and the material circumstances surrounding the

submission of PO 72423 demonstrate that Precise did not promise to obtain its requirements

exclusively from RBC for five years by submitting a PO for its 2010 requirements.  The

evidence to that effect is so overwhelming that no reasonable jury could have found to the

contrary.  A promise of exclusivity, however, is "[a]n essential element of the valid requirements

contract."  *Propane Indus.*, 429 F. Supp. at 219.  "In the absence of such a promise . . . [t]he

promise of the seller becomes merely an invitation for orders and a contract is not consummated

until an order for a specific amount is made by the buyer."  *Id.* (citations omitted).  Accordingly,

because no reasonable jury could have found an essential element of RBC's claim, Precise's

Rule 50(b) motion is granted.  The judgment entered in favor of RBC (doc. # 222) is vacated and

judgment shall enter in favor of Precise.[18]

Here, Precise placed an order for the bearings it needed during 2010 that incorporated

RBC's pricing, and that is the full extent of the agreement between the parties.  Because the jury

erroneously found that Precise breached a five-year requirements contract, it did not answer

whether Precise or RBC was the first to breach the agreement for 2010 deliveries contained in

---

[18] Although Precise never raised the contract-interpretation issue, judgment as a matter of law is appropriate in this case because upholding a verdict granting RBC five years of damages when the contract was valid for no more than eight months would result in manifest injustice to Precise.  *See Galdieri-Ambrosini*, 136 F.3d at 287 (holding court may only grant Rule 50(b) motion on grounds not specified in Rule 50(a) motion if " required to prevent manifest injustice"); *Cruz*, 34 F.3d at 1155 (same); *Baskin*, 807 F.2d at 1134 (same).

PO 72423.  The resolution of that issue involves questions of fact; accordingly, the parties are entitled to a new trial on liability and damages with respect to the claims and counterclaims for breach of the contract for 2010 deliveries that the parties actually entered into.

In the alternative, even if this ruling does not survive appeal, Precise is entitled to a new trial on liability.  As discussed above, the jury's verdict awarding RBC damages for Precise's breach of a five-year requirements contract is manifestly against the weight of the evidence in this case.  Moreover, the jury instructions may have materially mislead the jury on this issue of formation of a requirements contract, because they failed to instruct that the pricing subject to 100% volume language in RBC's price quote was ambiguous as a matter of law and also failed to explain that a buyer may respond to a seller's offer to enter into a requirements contract by placing an order or orders without expressly or impliedly promising to purchase its requirements exclusively from the seller.  Accordingly, should my ruling on the Rule 50(b) motion be reversed, Precise's motion for a new trial is granted.

My ruling today makes it unnecessary to consider whether Precise is entitled to a new trial on damages related to the post-2013 period.  Accordingly, Precise's motion for a new trial on damages is denied as moot.

## IV.    Conclusion

For the foregoing reasons, Precise's motions (docs. # 195 & 226) are GRANTED in part and DENIED in part.

It is so ordered.

Dated at Bridgeport, Connecticut, this 29th day of May 2014.


/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge